UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SCHOLARCHIP CARD, LLC,

                              Plaintiff,

                -against-

TRANSWORLD SYSTEMS, INC. and
UNIVERSITY ACCOUNTING SERVICE, LLC,

                              Defendants.

**SEALED
MEMORANDUM & ORDER
17-CV-6296 (NGG) (SIL)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff ScholarChip Card, LLC ("ScholarChip") commenced this action on October 27, 2017 seeking a declaratory judgment and asserting various causes of action in contract and quasi-contract arising out of its agreements with Defendants to develop software for servicing student loans and to host related data. (*See generally* Compl. (Dkt. 1).) Now before the court is Defendants' motion for partial summary judgment and to strike certain portions of ScholarChip's Local Rule 56.1 Response. (*See* Mot. for Summ. J. (Dkt. 85); Defs. Rule 56.1 Reply ("56.1 Reply") (Dkt. 84-10) at 2 (moving to strike those "portions of Plaintiff's Counter-Statement which fail to comply with Local Civil Rule 56.1").) Specifically, Defendants seek summary judgment on all of ScholarChip' claims except for its declaratory judgment claim. Defendants also move, with ScholarChip's consent, for leave to file certain documents and exhibits under seal. (*See* Dkt. 84.)

For the reasons that follow, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion to strike certain portions of ScholarChip's 56.1 Response is likewise GRANTED IN PART and DENIED IN PART. Finally, the court defers decision on the motion for leave to file under seal pending further submissions from the parties.

## I.   BACKGROUND

### A.   Local Rule 56.1 and Plaintiff's Rule 56.1 Response

As an initial matter, the court cannot begin to set forth the summary judgment record without first addressing the serious defects in Scholarchip's Rule 56.1 Response and Counterstatement. Under Local Rule 56.1, a party moving for summary judgment must submit "short and concise statement, in numbered paragraphs, of the material facts as to which [it] contends there is no genuine issue to be tried," while the party opposing summary judgment must respond with "correspondingly numbered paragraphs responding to … the statement of the moving party." Local R. 56.1(a)-(b). "Each statement by the movant or opponent … including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible." Local R. 56.1(d). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).[1]

Defendants' Local Rule 56.1 Statement generally adheres to these requirements. The same cannot be said, however, for ScholarChip's response. Rather than providing a concise response to each statement followed by a citation to admissible evidence, as the rule requires,  ScholarChip opted to treat its responses as if it were objecting to discovery demands, burying its position beneath layers of improper form objections and legal argument. (*See, e.g.*, Pl.'s Local R. 56.1 Resp. & Counterstatement ("56.1 Resp.") (Dkt. 84-2) ¶¶ 9, 48.) These practices are, in the best case, unproductive and contrary to the entire purpose of Local Rule 56.1 in that, rather than "assist[ing] the court by

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

narrowing the scope of issues to be adjudicated," *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014), they force the court to wade through pages of superfluous text to ascertain what, if anything, is legitimately disputed.

It would be one thing if this were simply a matter of overzealous lawyering and unfamiliarity with the court's local rules. Setting aside the fact that ScholarChip's counsel appears to primarily practice in this state, that theory cannot explain the substance of many of Plaintiff's objections. For example, there is no logical basis for Plaintiff to assert that Defendants' proffering of a statement made in a letter written by Plaintiff's principal cannot "seek to establish … the truth" of such statement when it would be plainly admissible for that purpose under the Federal Rules of Evidence. (56.1 Resp. ¶ 30.) Likewise, ScholarChip asserts numerous objections that make no sense in context, such as when it objects to several communications dated before April 20, 2017 as not having been sent "until after … April 20, 2017." (*e.g.*, *id.* ¶¶ 61-65, 67-68.) Finally, some of ScholarChip's objections are simply so bizarre as to border on the absurd. (*See, e.g.*, *id.* ¶ 25 (objecting to factual statement as "vague" because it uses an *id.* citation rather than full citation).) While the court will decide this case as it endeavors to decide every case that comes before it, on the merits, ScholarChip's counsel does himself and his client no favors by making that task needlessly difficult.[2]

Accordingly, the court will grant Defendants' motion to strike those portions of ScholarChip's responses to Defendants' 56.1 Statement that do not comply with Local Rule 56.1. Specifically, the court strikes all sentences that are not supported by citations to the record except those that begin with the word "Undisputed." To the extent that this leaves certain facts without any

---

[2] The court notes that Defendants' reply to ScholarChip's counterstatement also exhibits some of these infirmities, although to a more limited degree. (*See, e.g.*, 56.1 Reply at ¶ 113.)

response (*e.g. id.* ¶ 54), the court deems those facts undisputed for the purpose of deciding this motion so long as they are otherwise supported by the record.

Defendants also object to much of ScholarChip's Rule 56.1 Counterstatement, which comprises paragraphs 90-118 of its Rule 56.1 Response. (*See* 56.1 Reply at 1-4.) Many of these objections are also well founded; the 56.1 Counterstatement purports to assert facts for which the evidence cited is plainly incompetent (*e.g.* 56.1 Resp. ¶ 91 (citing affidavit by ScholarChip's principal as sole support for statement about Defendants' purported intentions)) and, in many cases, includes more than one fact in a single paragraph (*e.g. id.* at ¶ 95 (stating that in 2014 Defendants were acquired by another company and that, during that time period, its negotiations with ScholarChip "were put on hold")). Notwithstanding these deficiencies, the court does not deem it necessary to strike the entirety of the counterstatement and thus denies Defendants' motion asking the court to do so. Instead, it will disregard those facts that are not material or for which there is no evidentiary support. *See, e.g.*, *Baity*, 51 F. Supp. 3d at 418-19 (S.D.N.Y. 2014) (collecting cases).

## B. Facts

The court draws the following statement of facts from the parties' Rule 56.1 statements (as modified) and the admissible evidence submitted therewith. The court construes the evidence in the light most favorable to ScholarChip and draws all reasonable inferences in its favor. *See, e.g.*, *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999) (collecting cases). Where the facts are in dispute, the court credits ScholarChip's version of events if it is supported by record evidence. *Id.* However, where fails to controvert properly supported factual statements with citations to admissible evidence, the court credits Defendants' version of events and deems such facts undisputed for the purpose of deciding this motion. *See, e.g.*,

*Scott v. City of New York*, No. 16-cv-834 (NGG), 2020 WL 208915, at *1 (E.D.N.Y. Jan. 14, 2020).

ScholarChip is a technology company servicing the education market. (56.1 Resp. ¶¶ 1-4.) ScholarChip was founded by Maged Atiya who, at all relevant times, was the company's Chief Technology Officer and co-owner. (*Id.*) Defendant University Accounting Service, LLC ("UAS") is a student loan servicing company. (*Id.* ¶ 8.) Defendant Transworld Systems, Inc. ("TSI") is the sole member of UAS. (*Id.* ¶ 6.)[3]

UAS hired ScholarChip in May 2006 to develop "eUAS," a loan servicing system for UAS intended to replace its existing system known as MACS, and to host necessary data related to such loans. (*Id.* ¶ 9.) The relationship between the companies was governed by three agreements, the Master Terms & Conditions ("MTC"), the Software Development Agreement ("SDA") and the Hosting Support Services Agreement ("HSA" and, together with the MTC and SDA, the "Agreements"). (*Id.* ¶ 10; *see also* MTC (Dkt. 84-4 at ECF 18-32); SDA (Dkt. 84-4 at ECF 34-41); HSA (Dkt. 84-4 at ECF 43-54).) Under the SDA, UAS was required to pay ScholarChip upon the achievement of three defined "milestones." (SDA § 3.) However, in July 2008, the parties executed an addendum to the SDA (the "Milestone Addendum"), which replaced the three milestones in the SDA with 17 smaller milestones and commensurately reduced milestone payments. (56.1 Resp. ¶ 11; Milestone Addendum (Dkt. 84-4 at ECF 56-57).) Between 2009 and 2011, ScholarChip sent UAS invoices for the completion of milestones 2, 3, 4, 5, 6, 7, 10, 11, and 14—all of which UAS paid. (56.1 Resp. ¶¶ 12-13.) On April 28, 2011, ScholarChip confirmed that the remaining milestones were still "open and unbilled." (*Id.* ¶ 14.) In August 2011, ScholarChip confirmed

---

[3] In this section, the court uses UAS to refer to both UAS and TSI, as well as TSI's various parents, all of which were negotiating with ScholarChip at various points in time.

to UAS that it had "invoiced UAS for all services, including custom programming, for all months prior to July 2011, and that there are no amounts payable by UAS that have not yet been invoiced to UAS for any period prior to July 2011. (*Id.* ¶ 18.) On October 23, 2013, ScholarChip issued UAS a statement of account as of that date that did not include any outstanding invoices for milestone payments. (*Id.* ¶¶ 20-21.)

The SDA and HSA contained, respectively, a three-year term and a two-year term subject to UAS's right to extend the agreement by three one-year terms upon sufficient notice to ScholarChip. (*See* SDA § 2; HSA § 3.) On August 5, 2011, ScholarChip agreed to continue providing interim services under the Agreements through September of that year, subject to a modified pricing scheme under which UAS would compensate ScholarChip based on the number of loans ScholarChip hosted. (56.1 Resp. ¶¶ 15-17.) Specifically, UAS agreed to pay ScholarChip $0.13 per MACS loan, $0.20 per federal loan, and $0.67 per private loan. (*Id.*) Through a series of letter extensions,[4] the parties ultimately extended the agreements, subject to the new interim prices, through December 31, 2015. (*Id.* ¶ 22; *see also* Feb. 3, 2016 Letter from M. Atiya to J. Petersen ("Termination Notice") (Dkt. 84-4 at ECF 109).) During this period, the parties were negotiating, *inter alia*, a new price structure and potentially a new arrangement regarding intellectual property rights to the eUAS system

---

[4] Although the court notes that the record here appears to be incomplete insofar as letter extensions appear to have been signed at some point after predecessor extensions had expired. (*See* Aug. 5, 2011 Letter Extension (Dkt. 84-4 at ECF 75) (extending through September 30, 2011); Aug. 27, 2012 Letter Extension (Dkt. 84-4 at ECF 77) (extending from September 2012 through February 2013); Dec. 4, 2014 Letter Extension (Dkt. 84-4 at ECF 79) (extending through December 31, 2015).) While the parties disagree on a great many things, this particular aspect of their relationship does not seem to be a point of controversy.

which, under the terms of the MTC, were held by UAS.[5] (*See* MTC § 11; 56.1 Reply ¶¶ 92; Apr. 25, 2013 E-mail from C. Keller to Various Individuals (Dkt. 84-8 at ECF 121-22).) According to Atiya, UAS advised him in September 2015 that it wished to transition from ScholarChip's platform and sever the companies' relationship. (Tr. of Sept. 21, 2018 Dep. of M. Atiya ("Atiya Tr.") (Dkt. 84-8 at ECF 39-65) at 68:5-8.)

On December 31, 2015, ScholarChip sent UAS a pricing proposal to take effect as of January 1, 2016. (*See* Dec. 31, 2015 E-mail and Attachment from M. Atiya to J. Petersen (Dkt. 84-4 at ECF 81-82).) The proposal provided pricing for two- and three-year terms with significant rate increases in either scenario. Specifically, per-loan pricing for MACS and federal loans would be unified and increase from $0.13 and $0.20 respectively to $0.60 for a two-year term or $0.30 for a three-year term, while per-loan pricing for federal loans would increase from $0.67 to $4.20 for a two-year term or $2.80 for a three-year term. (*Id.*; 56.1 Resp. ¶¶ 25-26.) UAS did not sign this agreement. (56.1 Reply ¶ 102.) On February 3, 2016, ScholarChip advised UAS, because UAS was "unwilling to agree in any increase in servicing rates," that it would continue to service UAS under the Agreements as modified by the previous interim pricing schedule until June 30, 2016, after which it intended to terminate its relationship with UAS.

---

[5] The parties spend a considerable amount of time disputing which of them owns the intellectual property rights to those aspects of eUAS related to the servicing of private loans. (*See, e.g.*, 56.1 Reply ¶ 91.) UAS takes the position that § 9 of the MTC, which grants UAS intellectual property rights in all of ScholarChip's work product created pursuant to the SDA, encompasses the private-loan components of eUAS. (*Id.*) ScholarChip, meanwhile, argues that the SDA did not contemplate that eUAS would begin servicing private loans and that the software developed for that purpose falls outside the SDA's scope. (*Id.*; *see also* 56.1 Resp. ¶ 14.) While this issue may be relevant to this case more broadly, it is irrelevant to the disposition of this motion and thus the court declines to resolve it at this time.

7

(Termination Notice; 56.1 Resp. ¶ 30.) Atiya testified that Schol-arChip sent this termination notice at the request of Jeffrey Wood, who worked for TSI, although he further testified that ScholarChip intended to leave the student loan servicing business at that point. (Atiya Tr. at 277:15-278:1.) On June 2, 2016, ScholarChip agreed to extend the cancellation date to July 31, 2016 upon UAS's agreement to increase MACS loan pricing from $0.13 to $0.20 per loan. (June 2, 2016 E-mail from M. Atiya to L. Myers (Dkt. 84-4 at 118).)

The parties continued negotiating a potential path forward dur-ing this period. While ScholarChip advised UAS that it did not intend to continue any development work or initiate new projects during this time, the record indicates that it did not entirely cease work for UAS, and Atiya testified that he overruled his subordi-nates when they proposed lowering the level of service ScholarChip provided to UAS. (*See* Tr. of Apr. 2, 2019 R. 30(b)(6) Dep. of ScholarChip Card, LLC by M. Atiya ("Pl. Tr.") (Dkt. 84-8 at ECF 67-72) at 152:12-20; Atiya Tr. at 277:1-14; *see also* Mar. 29, 2016 E-mail from M. Atiya to L. Myers (Dkt. 84-4 at ECF 11); May 18, 2016 E-mail from E. Schulton to L. Bennett (Dkt. 84-4 at ECF 113); May 25, 2016 E-mail from E. Schulton to L. Bennett (Dkt. 84-4 at ECF 115-117); July 26, 2016 E-mail from J. Petersen to L. Bennett and M. Atiya (Dkt. 84-9 at ECF 2).)

The parties continued unsuccessful negotiations past the sup-posed July 31, 2016 termination date. (*See, e.g.*, 56.1 Resp. ¶¶ 42-43.) During this time, the court assumes that ScholarChip was continuing to provide services to UAS at the existing rates as modified by the June 2016 agreement to increase MACS loan pricing, although the record does not reflect a formal agreement between the parties to do so. On February 9, 2017, representa-tives of the parties met in New York and UAS informed ScholarChip that it intended to transition to a new loan servicing platform. (56.1 Resp. ¶ 44.) That same day, Ethan Schulton (a

ScholarChip employee) emailed Lori Bennett (a UAS employee), copying Atiya, advising Bennett that Atiya had "asked [Schulton] to halt all system enhancements … until a new closed end agreement is signed." (*Id.* ¶ 45.) Mr. Schulton reiterated this position on February 14, 2017. (*Id.* ¶ 46.)

On February 17, 2017, UAS general manager Joel Petersen sent ScholarChip a proposed transition plan that provided for $350,000 in additional compensation to ScholarChip, plus a transfer of UAS's intellectual property rights in the eUAS platform,[6] in exchange for ScholarChip facilitating UAS's transition to its new platform; this transition was to take place over a 15-month period during which time UAS would pay ScholarChip at the interim pricing rates then in effect. (*See* Feb. 17, 2017 Letter from J. Petersen to M. Atiya (Dkt. 84-5 at ECF 94-97) at 3.) ScholarChip did not view this offer favorably; Atiya advised Luke Myers (of Platinum Equity, TSI's parent company at this point) in an e-mail that the proposal had "closed all avenues of negotiation." (56.1 Resp. ¶ 48.) ScholarChip formally responded to the proposal by letter on February 23, 2017, in which Atiya wrote that ScholarChip and UAS "agree[d] in principle" with the overall approach to the transition but criticized UAS's proposed terms as "patently unreasonable." (Feb. 23, 2017 Letter from M. Atiya to J. Peterson (Dkt. 84-5 at ECF 98-99) ¶ 1.) ScholarChip also took the position that the Agreements had been fully terminated. (*Id.* ¶ 2.) UAS responded on March 2, 2017, insisting that the Agreements were still in effect and requesting that ScholarChip agree to an in-person meeting to be held within the next ten business days to further discuss possible avenues forward. (56.1 Resp. ¶¶ 50-52; Mar. 2, 2017 Letter from J. Petersen to M. Atiya (Dkt. 84-4 at ECF 86-89).) UAS also advised ScholarChip that the

---

[6] For the avoidance of doubt, the court is not resolving the issue of which party actually had intellectual property rights in those parts of eUAS over which ScholarChip asserts such rights.

"transition of UAS' client data is not as simple as providing de-conversion files." (Mar. 2, 2017 Letter from J. Petersen to M. Atiya at 3.) On March 24, 2017, Petersen sent Atiya a "High Level Framework" to "guide [their] discussions [that day]" containing a detailed list of tasks that UAS deemed necessary to complete a transition. (Mar. 24, 2017 E-mail and Attachment from J. Petersen to M. Atiya and S. Zhou (Dkt. 84-5 at ECF 104-105).)

Internal ScholarChip communications suggest that at this point ScholarChip believed it was a priority to "get [UAS] to commit in writing" to a pricing increase. (56.1 Resp. ¶ 53.) On March 28, 2017, Atiya sent a letter to Joel Petersen dated as of the previous day stating that "consistent with [their] discussions on March 17, 2017, March 21, 2017, and March 24, 2017," the rate for private loans would increase from $0.67 to $1.80 per loan, and that ScholarChip would begin providing deconversion data "[u]nless there is an objection or resistance to this agreement." (56.1 Resp. ¶¶ 55-56; Mar. 27, 2020 Letter from M. Atiya to J. Petersen (Dkt. 84-5 at ECF 92).) On March 30, 2017, Atiya emailed Petersen and stated that, "[a]s per [their] conversation from a few minutes ago … [o]nce you accept our letter with the new rates we will place [an Oracle database with the loan information] on our SFTP server." (Mar. 30, 2017 E-mail from M. Atiya to J. Petersen (Dkt. 84-5 at ECF 109).) Petersen responded shortly thereafter advising Atiya that the proposal and the March 27 letter were not consistent with the terms of their March 24 conversation, and that UAS's position was that any increase in rates had to be coupled with ScholarChip beginning transition development work. (Mar. 30, 2017 E-mail from J. Petersen to M. Atiya (Dkt. 84-5 at ECF 109).) Petersen further explained that UAS was waiting for ScholarChip to respond to UAS's proposal concerning the scope and nature of the development work and that they "could not move forward without this information as [UAS] will not know how to direct or define the development work required for the transition plan." (*Id.*)

On April 3, 2017, ScholarChip sent UAS an invoice for the previous month's hosting services at a rate of $1.80 per private loan. (56.1 Resp. ¶ 59.) In response to internal questions at UAS about the raised rates, Petersen advised that it was "in the midst of negotiating with [ScholarChip] and that this [price increase] [was] not part of any agreement." (Apr. 3, 2017 E-mail from J. Petersen to AP.Invoices-TSICO listserv (Dkt. 84-5 at ECF 115).) On May 2, 2017, UAS replied to ScholarChip by letter stating that the rates charged in the April invoice were "drastically different than any previous invoice received, our current existing contracts, or any conversation or communication between UAS and ScholarChip" and provided a check for payment based on the interim rates "as full payment … satisfaction, release, and discharge" of the disputed invoice. (*Id.* ¶ 60.)

On April 12, 2017, UAS sent ScholarChip a proposed Technology Transition Plan ("TTP"), under which UAS would agree to pay ScholarChip the increased rate of $1.80 per private loan upon ScholarChip's achievement of a set of initial milestones, which included providing UAS with the data ScholarChip was hosting on its behalf and developing a detailed framework to implement the actual transition. (*Id.* ¶¶ 61-65.) In response, ScholarChip advised UAS that it did "not see a point in continuing discussions related to" the TTP and asserted that ScholarChip had "instituted new loan servicing fees commencing as of March 2017 billing." (Apr. 13, 2017 Letter from M. Atiya to J. Petersen (Dkt. 84-5 at ECF 140); *see also* 56.1 Resp. ¶ 66.) On April 14, 2017, UAS demanded ScholarChip provide a reasonable response to the TTP and asserted that ScholarChip's attempted price increase was "void and unenforceable." (56.1 Resp. ¶¶ 67-68.) ScholarChip responded on April 17, 2017; in this response, it did not provide the requested response regarding the TTP but reiterated that it had submitted an invoice "reflecting new loan servicing fees in March 2017 that reflect prevailing market rates" and asked UAS to "please advise if [it] rejects these terms." (Apr. 17, 2017 Letter

from M. Atiya to J. Petersen (Dkt. 84-5 at ECF 147).) ScholarChip further stated that it would "place an encrypted copy of the … database data on [its] SFTP server" and that it would "place a final copy at such time when UAS is ready for final conversion, subject to agreed upon fees." (*Id.*; *see also* 56.1 Resp. ¶¶ 69-70.)

On April 20, 2017, ScholarChip emailed UAS to advise that it had placed a copy of the eUAS deconversion data on an outgoing SFTP server in Oracle 12 format. (*Id.* ¶ 71.) UAS downloaded this data sometime in April or May of that year. In mid-May 2017, ScholarChip, with Atiya's explicit knowledge and permission, instituted new limitations on web service access that it anticipated would "adversely affect" UAS and one of its clients. (*Id.* ¶ 73-75.) When he instituted this limit, Schulton told Atiya that he "expect[ed] [UAS] to complain first thing in the morning :)." (*Id.* ¶ 74.) According to internal ScholarChip communications, this limit was instituted to halt UAS's efforts to deconvert its clients, with Ethan Schulton stating that "[u]nless we work to stop web services, we may not be able to prevent such deconversions." (*Id.* ¶ 73.) Schulton and others have also testified, however, that they were concerned that UAS's pulling of large amounts of data from the server threatened overall system stability and the integrity of the eUAS platform. (*Id.*) Further, Atiya testified that he consistently "overruled" Schulton regarding continuing to provide service to UAS. (*Id.*) In June 2017, Schulton suggested to Atiya that ScholarChip disable certain environments that he suspected UAS may be using to further its deconversion efforts. (*Id.* ¶ 78.) It is unclear, however, whether this plan was actually effectuated.

On May 26, 2017, Lori Bennett (a UAS employee) advised Atiya that the Oracle 12 database ScholarChip had provided appeared to be incomplete and that "[t]here are numerous tables that we did not receive, some we suspect we need and others we aren't even certain what they are for." (*Id.* ¶ 76.) Schulton responded

explaining that ScholarChip had "excluded tables we do not be-
lieve are relevant to [UAS's] deconversion efforts," including
some that ScholarChip asserted were ScholarChip's intellectual
property. (*Id.* ¶ 77; May 26, 2017 E-mail from E. Schulton to L.
Bennett (Dkt. 84-6 at ECF 35).) On June 21, 2017, Jeffrey Wood
wrote to Atiya that ScholarChip had not provided a complete set
of UAS's data and requested that ScholarChip provide a complete
copy by no later than June 30. (56.1 Resp. ¶ 79; *see also* June 21,
2017 Letter from J. Wood to M. Atiya (Dkt. 84-6 at ECF 47-48).)
Wood also wrote that UAS had "been open to increasing pricing
on a per loan basis for private loans . . . [but] such change was
contingent upon ScholarChip" agreeing to amend the parties'
contracts and create a transition plan. (June 21, 2017 Letter at
1.) However, Wood wrote, "ScholarChip rejected such offer in its
entirety and unilaterally increased pricing prior to supplying any
data to UAS." (*Id.*) Five days later, on June 26, 2017, Petersen
wrote to Atiya reiterating Wood's demand and advising that "[i]f
Scholarchip engages in substantive discussions (regarding a tran-
sition plan), UAS may entertain increased pricing for private loan
servicing beginning on the date a signed agreement is executed
by UAS and ScholarChip." (56.1 Resp. ¶ 80; *see also* June 26,
2017 Letter from J. Petersen to M. Atiya (Dkt. 84-6 at ECF 54-
55).) ScholarChip asserts that it complied with UAS's request for
a full set of data on July 17, 2017, although it proffers only Atiya's
declaration in opposition to the instant motion as support for this
proposition. (56.1 Reply ¶ 107.)

On June 30, 2017, UAS filed a complaint against ScholarChip in
the Eastern District of Wisconsin, although that action was ulti-
mately dismissed on October 27, 2017 for lack of personal
jurisdiction. *See Univ. Accounting Serv., LLC v. ScholarChip Card,
LLC*, No. 17-cv-901, 2017 WL 4877418 (E.D. Wis. Oct. 27, 2017);
56.1 Resp. ¶ 81. On July 14, 2017, while that action was pending,
ScholarChip's counsel wrote to UAS demanding payment for the
outstanding milestones. (56.1 Resp. ¶ 82.)

It is unclear whether, as of December 20, 2018, UAS's replacement system for eUAS was fully operational. (*See* Tr. of Dec. 20, 2018 Dep. of L. Bennett (Dkt. 84-8 at ECF 83-92) at 79:4-80:20.) Further, UAS apparently considered hiring Ethan Schulton at some point in 2018 to help it complete the deconversion process, although it does not appear that UAS ever formally offered him a position. (*Id.* at 81:3-85:3.) As of May 9, 2019, ScholarChip was continuing to host UAS's loan data, for which UAS has not offered to pay in excess of $0.67 per private loan hosted. (56.1 Reply ¶¶ 110-111.) In the absence of any information suggesting otherwise, the court assumes that this arrangement persists.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the non-moving party has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (alteration adopted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"To determine whether an issue is genuine, 'the inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" *Mikhaylov v. Y & B Trans. Co.*, No. 15-cv-7109 (DLI), 2019 WL 1492907, at *3

(E.D.N.Y. Mar. 31, 2019) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995)). Nonetheless, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (citation and internal quotation marks omitted).

## III. DISCUSSION

Defendants seek summary judgment on six of ScholarChip's seven claims. Specifically, Defendants seek summary judgment on ScholarChip's claims for breach of contract and account stated arising out of Defendants' failure to make the milestone payments that ScholarChip alleges are due under the contract; for breach of contract arising out of a supposed oral agreement to increase per-loan pricing for private loans to $1.80, which ScholarChip claims was formed on March 21, 2017; for promissory estoppel arising out of that same alleged oral agreement; and for unjust enrichment and quantum meruit arising out of Defendants' purported failure to properly compensate ScholarChip for hosting loan data beginning in April 2017.

As discussed in greater detail below, the court agrees with Defendants that ScholarChip has failed to make out its breach of contract claims, as well as its account stated and promissory estoppel claims. However, disputed issues of fact render ScholarChip's unjust enrichment claim inappropriate for summary adjudication.

### 1.    Claims Premised on The Milestone Payments

ScholarChip asserts claims for breach of contract and account stated in the amount of $240,000 arising out of Defendants' purported failure to compensate it for the completion of milestones 8, 9, 12, 13, 15, 16, and 17. (Compl. ¶¶ 43-61.) Defendants argue that these claims must be dismissed because of ScholarChip's conceded failure to invoice UAS for this work as is required under

the MTC and SDA, and because the record is devoid of any evidence indicating that ScholarChip actually completed the milestones. (Mem. in Supp. of Mot. ("Mem.") (Dkt. 85-2) at 14-17.) ScholarChip argues in response that the requirement that it invoice UAS is not a contractual condition precedent to UAS's obligation to pay and, in passing, that it achieved the milestones. (Mem. in Opp. to Mot. ("Opp.") (Dkt. 85-3) at 10-14.)

a.   *Breach of Contract*

To make out a claim for breach of contract under New York law, a plaintiff must allege and prove: (1) the existence of a contract between the parties, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from that breach. *See, e.g.*, *Johnson v. Nextel Comms., Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).

Defendants contend that ScholarChip's claim cannot survive because ScholarChip has failed to make a sufficient showing as to the second prong of its contract claim, *i.e.* that ScholarChip actually achieved the milestones. Defendants are correct.

In support of the proposition that ScholarChip did, in fact, achieve the milestones, ScholarChip offers affidavits from Atiya and Craig Keller, a former UAS employee. Atiya testified that "[t]he Agreements obligate ScholarChip to achieve certain enumerated milestones … all of which ScholarChip achieved," (Oct. 26, 2018 Decl. of M. Atiya (Dkt. 84-8 at ECF 12-20) ¶ 38; May 9, 2019 Aff. of M. Atiya (Dkt. 84-8 at ECF 32-37) ¶ 7), and that "the milestones were not completed until early 2012" (May 9, 2019 Aff. of M. Atiya ¶ 8) because UAS asked ScholarChip to perform work not contemplated by the original agreements. Keller, meanwhile, testified that "[i]t was common knowledge at NCO and TSI that ScholarChip had not been paid certain 'milestone payments' for milestones that it had achieved pursuant to its agreement to develop the eUAS software platform." (May 7, 2019 Aff. of C. Keller (Dkt. 84-8 at ECF 117-119) ¶ 17.)

Drawing every inference in ScholarChip's favor, these affidavits do not suffice to create a triable issue of fact. It is well established that a non-movant cannot defeat a motion for summary judgment by affidavits that are conclusory or not based on the affiant's personal knowledge. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 n.5 (2d Cir. 1998); *see also, e.g.*, *Mason Tenders District Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 15 (S.D.N.Y. 2019) ("Self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact."). Here, Atiya offers no support for his conclusory assertions that ScholarChip achieved the milestones, nor does he set forth the basis of his supposed knowledge of this fact. Atiya's assertion, moreover, finds no support in the voluminous record of this case; indeed, the record indicates that ScholarChip issued a statement of account in 2013—after, according to Atiya, the milestones were completed—that made no mention of the supposed outstanding milestone payments. *See Walker v. Carter,* 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) ("As a general matter, a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." (collecting cases)). Keller, likewise, testified that it was "common knowledge" that ScholarChip had achieved the milestones but provides no basis for this assertion nor any way for the court to conclude that it is premised on anything other than hearsay. *See Wright v. United States*, No. 13-cv-1379 (JFB), 2017 WL 3142041, at *1 (E.D.N.Y. July 24, 2017) (disregarding assertion by plaintiff's expert that fact was "common knowledge" as "conclusory" and "entirely unpersuasive in light of the lack of evidence to support it").

Accordingly, and in the absence of any other record evidence supporting the proposition that ScholarChip did, in fact, achieve the milestones at issue, the court concludes that ScholarChip has failed to adduce evidence sufficient to support its breach of contract claim and grants summary judgment to Defendants.

### b. Account Stated

"An account stated is an agreement between parties to an account based on prior transactions between them with respect to the correctness of the account items and balance due." *H. Daya Int'l Co. v. Arazi*, 348 F. Supp. 3d 304, 311 (S.D.N.Y. 2018). "To prevail on a claim for account stated [under New York law], a plaintiff must establish the following elements: (1) an account was presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated." *Yiwu Lizhisha Accessories Co. v. Jjamz, Inc.*, 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018). "The second and third requirements … may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *Id.*

ScholarChip's account stated claim is easily disposed. Though the court does not resolve today whether ScholarChip's obligation to invoice UAS amounts to a contractual condition precedent to UAS's obligation to pay ScholarChip, it is undoubtedly a condition precedent to ScholarChip prevailing on a claim for account stated. The record, however, is devoid of any evidence that ScholarChip did, in fact, invoice UAS for the unpaid milestones or otherwise tender the account. ScholarChip confirmed in 2011 that UAS did not owe it any money for the open milestones, and, in 2013 (after Atiya claims the milestones were completed), issued a statement of account that did not include the open milestones. (56.1 Resp. ¶¶ 14, 18, 20-21.) Indeed, according to the record, ScholarChip did not attempt to collect on the milestones in any form until 2017, when its counsel wrote a demand letter to UAS. (*Id.* ¶ 82.) That letter, however, referred to only three unspecified milestones (rather than the seven milestones ScholarChip now claims are open) and demanded payment of $500,000 (rather than the $240,000 ScholarChip now claims it is owed). (*Compare* July 14, 2017 Letter from R. Friedman to B. Sugar (Dkt. 84-6 at ECF 71-72) *with* Compl. ¶¶ 48-54.) As such,

even if this were otherwise sufficient to show that *an* account was tendered, a matter that the court need not resolve, it does not suffice to show that the specific account on which ScholarChip premises its claim was tendered.

The court thus grants summary judgment to Defendants with respect to ScholarChip's account stated claim.

### 2. Claims Premised on The Alleged Oral Agreement

ScholarChip brings claims for breach of contract and promissory estoppel premised on an alleged oral agreement between ScholarChip (by Atiya) and UAS (by Petersen) under which UAS purportedly agreed to pay ScholarChip $1.80 per private loan in exchange for ScholarChip providing UAS with its loan database in Oracle 12 format. (Compl. ¶¶ 55-61.)

Under New York law, a contract need not be written to be enforceable. *See, e.g.*, *Delaney v. Bank of America Corp.*, 766 F.3d 163, 171 (2d Cir. 2014). In an action for breach of an oral agreement, however, "the burden of establishing the [existence and] terms of [a] verbal contract" rests with the party seeking enforcement. *Charles Hyman, Inc. v. Olsen Indus., Inc.*, 642 N.Y.S.2d 306, 309 (1st Dep't 1996).

Here, the only evidence of any such agreement is an assertion in one of Atiya's affidavits that "[o]n or around March 21, 2017, ScholarChip and UAS (via Mr. Petersen) entered into an oral agreement whereby UAS would increase its payments ... if ScholarChip agreed to deliver client data to UAS in Oracle 12 format." (Oct. 26, 2018 Decl. of M. Atiya ¶ 61.) Aside from this statement, however, nothing in the record supports the proposition that any oral agreement was formed. Indeed, Atiya himself wrote to Petersen *after* the supposed agreement was formed to say that ScholarChip would upload data in Oracle 12 format "once [UAS] accepts [ScholarChip's] letter with [ScholarChip's] new rates." (Mar. 30, 2017 E-mail from M. Atiya to J. Petersen.) Weeks later,

Atiya wrote to Petersen again advising that ScholarChip had "in-stituted new loan servicing fees commencing as of March 2017 billing." (Apr. 13, 2017 Letter from M. Atiya to J. Petersen.) And, four days after that, Atiya again wrote to Petersen to advise that ScholarChip had submitted an invoice "reflecting new loan ser-vicing fees in March 2017 that reflect prevailing market rates" and asked Petersen to "please advise if UAS rejects these terms." (Apr. 17, 2017 Letter from M. Atiya to J. Petersen.) Throughout this period, UAS consistently endeavored to negotiate an agree-ment of which increased pricing would be one component, and Atiya consistently rejected UAS's offers without at any point in-dicating that such agreement was unnecessary given that the parties had already agreed to that same price increase.

In short, even when viewed in the light most favorable to Schol-arChip, Atiya's own contemporaneous conduct is irreconcilable with his claim that the parties entered into an oral agreement. As such, Atiya's bare assertion of an agreement is simply insufficient to create a triable issue of fact as to whether such an agreement was formed. *See Grimaldi v. Promuto*, No. 13-cv-1692 (AJN), 2014 WL 12657039, at *3 (S.D.N.Y. Oct. 17, 2014) (granting summary judgment on claim for breach of oral agreement where "no evidence supports its existence, except for Plaintiff's own deposition testimony"). Consequently, the court grants UAS's motion to dismiss ScholarChip's claim for breach of the parties' alleged oral agreement.

Insofar as ScholarChip has failed to establish that it entered an oral agreement with UAS, it has likewise failed to adduce evi-dence establishing that UAS made "a clear and unambiguous promise" to pay the increased rates. *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 43 (2d Cir. 1995). Accordingly, the court also grants summary judgment to Defendants on Scholar-Chip's promissory estoppel claim.

### 3.   Unjust Enrichment

Finally, ScholarChip asserts quasi-contractual claims arising out of its ongoing hosting of UAS's loan data for what it asserts is below-market compensation. (Compl. ¶¶ 68-78.)[7] Under New York law, "[t]o prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Reingold v. Bowins*, __ N.Y.S.3d __, 180 A.D.3d 722, 723 (2d Dep't 2020). While this claim presents something of a close call, genuine disputes of fact preclude summary judgment for Defendants.

The theory of ScholarChip's unjust enrichment claim is rather straightforward. According to ScholarChip, since April 2017 it has been hosting Defendants' loan data on its platform in the absence of any agreed-upon pricing, as the last interim pricing agreement expired years earlier, and Defendants have offered to compensate it at below-market rates. Under the circumstances, ScholarChip contends, Defendants should be required to pay ScholarChip the fair value of those services. (*See* Opp. at 20-23.) Defendants argue that ScholarChip cannot prevail on this claim because, *inter alia*: (1) the claims are barred because the parties' relationship is governed by the Agreements, (2) UAS has not benefitted from ScholarChip's conduct because it has been unable to transition its clients to its new platform, (3) ScholarChip has actively hindered UAS's efforts to transition to its new system, and

---

[7] While ScholarChip advances distinct claims for unjust enrichment and quantum meruit, the court analyzes them together "since the latter is merely the means by which the former is remedied." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 917 F. Supp. 265, 270 (S.D.N.Y. 1996), *rev'd on other grounds*, 102 F.3d 660 (2d Cir. 1996); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 n.9 (2d Cir. 2009) ("Applying New York law, [a court] may analyze quantum meruit and unjust enrichment claims together as a single quasi contract claim.").

(4) the $1.80 rate per private loan that ScholarChip demands exceeds ScholarChip's own expert's estimation of prevailing market rate for these services. (Mem. at 21-25; Reply Mem. in Further Supp. of Mot. (Dkt. 85-4) at 9-10.)

Defendants' first argument is puzzling. While it is true that the existence of a valid contract (or other remedy at law) typically bars recovery in equity, *see, e.g.*, *Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 188-89 (E.D.N.Y. 2004), the crux of ScholarChip's unjust enrichment claim is that no enforceable agreement regarding pricing existed between the parties. Given that the last interim pricing agreement—which provides the rates at which UAS has been offering to settle ScholarChip's invoices (*see, e.g.*, Mar. 2, 2018 Invoice (Dkt. 84-6 at ECF 162)—expired at the latest on July 31, 2016 (and the court has granted Defendants summary judgment on ScholarChip's claim that there was an enforceable oral agreement), there does not appear to have been any agreement in place between the parties as to pricing as of the period for which ScholarChip seeks recovery. Further, while Defendants are correct that certain provisions of the Agreements impose obligations that survive termination of the Agreements themselves, none of the provisions specifically deemed interminable relates to the price for ScholarChip hosting private loans. As such, if ScholarChip has any remedy, it lies in equity. *See Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 297 (E.D.N.Y. 2013) ("When an agreement is unenforceable or there is no contract, a party may recover for services performed on a quantum meruit basis." (applying New York law)).

UAS's next argument, that it derived no benefit from ScholarChip hosting private loan data, cannot be resolved at this stage. While the record indicates that UAS was seeking to transition off the eUAS platform and that it had purchased a new loan servicing platform for that explicit purpose (*see* Bennett Tr. at 77:5-76:22), it is not clear whether that system was or is fully operational such

that Defendants would not have needed or do not need Scholar-Chip to host any data for what ScholarChip contends is not fair compensation (*id.* at 78:17-80:20). The court also notes that Defendants attempted to negotiate a transition process, during the pendency of which ScholarChip would continue to host UAS's data for at least some period of time. While it may be the case that UAS derived and continues to derive no benefit from ScholarChip's hosting of its data, on this record, the court cannot make this conclusion as a matter of law.

Defendants' third argument, which the court construes as a motion for summary judgment on their affirmative defense of unclean hands, is likewise unavailing. "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when … the party seeking to invoke the doctrine was injured by such conduct." *Jara v. Strong Steel Door, Inc.*, 871 N.Y.S.2d 363, 365 (2d Dep't 2009); *see also Medical Soc'y of the State of N.Y. v. UnitedHealth Grp., Inc.*, 332 F.R.D. 138, 150 (S.D.N.Y. 2019) ("To succeed on an unclean hands defense, a defendant must demonstrate that the plaintiff engaged in fraudulent, deceitful, or bad-faith behavior."). To be clear, it is not the case here that there is no evidence in the record to support a defense of unclean hands; as Defendants note, ScholarChip appears to have taken at least some actions with the goal of hindering UAS's deconversion efforts (*see, e.g.*, 56.1 Resp. ¶¶ 73-75). In addition, Defendants argue that the data that ScholarChip provided UAS to aid in its deconversion efforts was incomplete and insufficient. (*See* Mem. at 24-25.) However, there is competing evidence as to ScholarChip's motives in, for example, limiting web services. Defendants have likewise adduced no direct evidence that ScholarChip provided UAS with incomplete data *for the purpose* of hindering UAS's transition plans, as would be necessary to succeed on its unclean hands defense; and although one might draw that inference, at this stage, the court may not.

Finally, the fact that the rate ScholarChip sought to charge—and which it now seeks to recover—is one cent higher than the high-end of the fair-market rates identified by ScholarChip's expert witness Bill Baumer (*see* Tr. of Dec. 7, 2018 Dep. of Bill Baumer (Dkt. 84-4 at ECF 91-97) at 205:4:20) does not entitle Defendants to summary judgment. As an initial matter, Mr. Baumer also opined that the $1.80 rate ScholarChip sought was fair; insofar as Defendants are seeking to impeach that statement with Mr. Bauman's deposition testimony, questions of Mr. Baumer's credibility are paradigmatically factual. (Expert Report of Bill Baumer (Dkt. 84-9 at ECF 88-102) at, *e.g.*, 15.) In any event, even if Defendants are correct that $1.80 exceeds fair market value, that would still not entitle them to the relief they seek. If ScholarChip prevails on its unjust enrichment claim, it will be entitled to recover the "reasonable value" of the services it provided to Defendants. *See, e.g., Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994). That may be $1.80 per private loan, it may be $0.67 per private loan, or it may fall somewhere in between, in which case ScholarChip would be entitled to recover the difference. The fact that ScholarChip may be overvaluing its services, however, does not bear on the question of whether Defendants are, as ScholarChip contends, undervaluing them. ScholarChip bears the burden of proving that it was undercompensated, and Defendants have not made a showing that it would be unable to discharge this burden.

Accordingly, the court denies summary judgment on ScholarChip's quasi-contract claim.

## IV.  THE PARTIES' MOTION TO FILE CERTAIN DOCUMENTS UNDER SEAL

Finally, the court addresses Defendant's consent motion to file certain documents under seal. While Defendants correctly recognize that sealing is appropriate when it is "essential to preserve higher values and is narrowly tailored to serve that interest"

(Mem. in Supp. of Mot. to Seal. (Dkt. 84) at 3 (quoting *PDV Sweeny, Inc. v. ConocoPhillips Co.*, No. 14-cv-5183 (AJN), 2014 WL 4979316, at *2 (S.D.N.Y. Oct. 6, 2014))), their sealing request is anything but "narrowly tailored." Aside from the parties' 56.1 statements and responses, which both sides reference liberally in their publicly filed memoranda of law, the motion would also have this court seal a number of documents that have already been filed on the public docket in this case or in related litigation between the parties such as the complaint, several affidavits, and the Agreements.

The court is thus inclined to deny Defendants' motion for leave to file under seal as currently presented. However, the court recognizes that there may be a legitimate need to protect at least some of these documents. Accordingly the parties are DIRECTED to confer and identify among the current record those documents that may be unsealed fully, those documents that may be unsealed with redactions, and those documents that the parties wish the court to seal. By no later than June 23, 2020, the parties shall file on the public docket all of the documents they conclude can be filed publicly. Concurrently therewith, the parties shall file under seal: (1) copies of those documents that they believe should be redacted with proposed redactions and a brief explanation of why such redactions are justified; and (2) a list of the documents the parties believe should be kept under seal and a brief explanation of why sealing is appropriate. If the parties fail to comply with this order, the court will deny the motion to seal and order Docket 84 and all attachments thereto unsealed.

Additionally, in an abundance of caution, the court is filing this Memorandum & Order under seal. Accordingly, the parties are DIRECTED to confer and submit proposed redactions that they believes the court should make prior to posting this decision on the public docket, as well as a brief explanation as to why such redactions are appropriate, by no later May 8, 2020. If the parties

do not submit proposed redactions, the court will order the entire decision unsealed.

## V.  CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 85) Motion for Summary Judgment IS GRANTED IN PART and DENIED IN PART. Specifically, the motion is granted as to Plaintiff's claims for breach of contract, account stated, and promissory estoppel. The motion is DENIED as to Plaintiff's quasi-contract claim.

The court DEFERS CONSIDERATION of Defendants' (Dkt. 84) Motion for Leave to File Under Seal for sixty days pending further submissions from the parties as set forth in Section IV of this Memorandum & Order.

The parties are further DIRECTED to confer and submit proposed redactions for this Memorandum & Order and an explanation of why such redactions are appropriate by no later May 8, 2020.

SO ORDERED.


Dated:    Brooklyn, New York
          April 24, 2020

                                            /s/ Nicholas G. Garaufis
                                           NICHOLAS G. GARAUFIS
                                           United States District Judge